**Esmelinda VALLES, Administratrix of the Estate of Lope Valles, Deceased, Ruben Valles,**

v.

**ALBERT EINSTEIN MEDICAL CENTER, Leonard H. Cohen, M.D., Archimede J. Silvestri, M.D., Paul H. Steerman, M.D., A. Silvestri Associates, Jay Morros, M.D., Mark Kramer, M.D., and Alan Wladis, M.D., Appellees.**

**Appeal of Esmelinda Valles, Administratrix of the Estate of Lope Valles, Deceased.**

Superior Court of Pennsylvania.

Argued April 17, 2000.
Filed Aug. 24, 2000.

Jonathan Briskin, Bryn Mawr, for appellant.

Francis J.J. McGovern, Trevose, for Morros, appellee.

Michael G. Sabo, Philadelphia, for Albert Einstein Medical, appellee.

Before: McEWEN, President Judge, and DEL SOLE, HUDOCK, EAKIN, JOYCE, STEVENS, MUSMANNO, ORIE MELVIN and TODD, JJ.

JOYCE, J.:

¶ 1 This is an appeal from the orders entered by the trial court granting the motion for summary judgment filed by Appellees, Albert Einstein Medical Center (AEMC) and the motion *in limine*/motion for nonsuit filed by Dr. Jay Morros in the underlying tort action commenced by Appellant, Esmelinda Valles, in her representative capacity as administratrix of the estate of the decedent, Lope Valles. For the reasons set forth below, we affirm. Before addressing Appellant's claims, we will set forth the relevant facts.

¶ 2 The decedent, Lope Valles, was initially admitted to AEMC in November of 1992, complaining of pain in his right foot. At the time of his admission, the surgical practice of Silvestri and Steerman Surgical Associates (SSSA) was designated as Mr. Valles' attending physicians.[1] It was suspected that an aortic aneurysm[2] was the cause of Mr. Valles' condition. Consequently, he was scheduled to have an aortogram.[3]

¶ 3 Mr. Valles was a non-insulin dependent diabetic. Due to Mr. Valles' elevated creatine levels, Mr. Valles' physicians consulted with Dr. Mark Kramer, a nephrologist, to ensure that Mr. Valles would be able to tolerate the contrast medium used in the aortogram. Following the consulta-

tion, it was determined that Mr. Valles' would be able to tolerate the procedure.

¶ 4 Dr. Muriel Gordon, a resident in the radiology department, obtained Mr. Valles' consent. The aortogram was performed by Steven Allen, D.O., a radiologist employed by AEMC. The aortogram confirmed the presence, location and size of the aortic aneurysm. However, Mr. Valles experienced a reaction to the contrast material and developed moderate renal failure. As a result, surgery to repair the aneurysm was postponed.

¶ 5 Mr. Valles was re-admitted to the hospital in December of 1992 at which time the aneurysm was successfully repaired. Unfortunately, Mr. Valles' kidney condition continued to deteriorate to the point that dialysis was required. To facilitate the dialysis, a temporary catheter was implanted. Mr. Valles developed an infection as well as a deep vein obstruction at the catheter site, thus necessitating its removal.

¶ 6 Because Mr. Valles required dialysis, his physicians decided to implant a more permanent catheter. Dr. Morros was to perform the surgery. Prior to the operation, Dr. Wladis, a medical resident affiliated with SSSA, informed Mr. Valles of the risks associated with the implantation of the catheter. However, he did not know where the catheter was to be placed in Mr. Valles' body and thus did not inform him of the medically recognized or medically viable sites for implantation.

¶ 7 During surgery, Dr. Morros decided to place the catheter in Mr. Valles' right subclavian vein.[4] Complications ensued in that Dr. Morros was unable to get the catheter to slide into its sheath. In at-

1. Dr. Cohen, Dr. Silvestri, Dr. Morros, Dr. Kramer and Dr. Wladis were all affiliated with SSSA.

2. An aneurysm is a dilation of the wall of an artery. Stedman's Medical Dictionary 82 (26 th ed.1995) (hereinafter Stedman's).

3. An aortogram is the image or set thereof resulting from an aortography, *i.e.*, the radio-

graphic imaging of the aorta by injection of a contrast medium. Stedman's at 110.

4. Other alternate sites were in the femoral or internal jugular veins. Dr. Morros did not deem these sites to be viable given Mr. Valles' condition, history of infection and prior treatment, which included utilization of some of the available sites.

tempting to reinsert a larger sheath, he discovered that the guidewire had penetrated the subclavian vein and entered Mr. Valles' chest, causing a left hemopneumothorax.[5] At this point, Mr. Valles went into cardiac arrest. Emergency resuscitative efforts commenced and resulted in the restoration of a cardiac rhythm. However, Mr. Valles lapsed into a coma due to oxygen deprivation. Mr. Valles never regained consciousness and died on January 16, 1993.

¶ 8 Ruben and Esmelinda Valles, the decedent's brother and sister, were appointed as the administrators of his estate.[6] They instituted suit by writ of summons against AEMC and Dr. Cohen, Dr. Silvestri, Dr. Morros, Dr. Kramer and Dr. Wladis, as well as SSSA.[7] Appellant subsequently filed a complaint in January of 1995. The complaint asserted wrongful death/survival actions premised upon the defendants' alleged negligence and failure to obtain the decedent's informed consent. The defendants filed preliminary objections which were sustained in part and dismissed in part. The defendants thereafter filed answers with new matter and cross-claims.

¶ 9 Through the course of discovery, Appellant narrowed her claims against the remaining defendants to vicarious liability on the part of AEMC, based on Dr. Allen's failure to obtain Mr. Valles' informed consent with respect to the aortogram, and Dr. Morros' failure to obtain Mr. Valles' informed consent regarding implantation

of the catheter. AEMC filed a motion for summary judgment in January of 1998. Dr. Morros subsequently filed a motion *in limine* in which he sought to preclude Appellant from introducing any evidence relating to informed consent. The Honorable Sandra Mazer Moss granted AEMC's motion but denied Dr. Morros' motion, thus leaving Dr. Morros as the sole remaining defendant.

¶ 10 The matter was assigned to the Honorable Samuel M. Lehrer for trial. Before the jury was selected, Dr. Morros renewed his motion *in limine*. For reasons that are unclear, the trial court characterized Dr. Morros' request as a motion for nonsuit.[8] The trial court granted Dr. Morros' motion, thus effectively terminating the litigation. Appellant timely appealed both Judge Moss' and Judge Lehrer's orders.[9]

¶ 11 This matter was originally assigned to a panel for disposition. This Court unanimously affirmed the orders entered by the trial court. Appellant subsequently requested reargument *en banc*. We granted Appellant's request. Having received the parties' supplemental briefs, the matter is now ripe for disposition. Appellant presents two issues on appeal: (1) whether the trial court erred in concluding that AEMC cannot be held vicariously liable for Dr. Allen's failure to obtain the decedent's informed consent with respect to the aortogram; and (2) whether the trial court erred in concluding that the

---

5. A hemopneumothorax occurs when air and blood accumulate in the chest cavity and causes the lung to collapse. Stedman's at 781.

6. Ruben Valles subsequently resigned, leaving Esmelinda as the sole representative of the decedent's estate.

7. By stipulation, SSSA, Dr. Cohen, Dr. Silvestri, Dr. Kramer and Dr. Wladis were dismissed from the action with prejudice. Consequently, these parties did not participate in the summary judgment/motion *in limine* proceedings. Nor are they participants in this appeal.

8. Because the jury had not heard any evidence, the grant of a nonsuit at this stage was procedurally improper. *See* Pa.R.C.P. 230.1, 1983 Explanatory Comment (providing that a motion for nonsuit may not be made prior to the conclusion of plaintiff's evidence as to liability). *See also Lewis v. United Hospitals, Inc.*, 547 Pa. 626, 631, 692 A.2d 1055, 1058 (1997) (holding that a nonsuit may not be entered by the trial court pursuant to Pa. R.C.P. 230.1 prior to the commencement of trial before the plaintiff's presentation of any evidence as to liability).

9. This Court initially quashed the appeal. Appellant sought reconsideration. We granted Appellant's request and reinstated the appeal.

informed consent doctrine did not require Dr. Morros to advise the decedent of alternate sites for placement of the catheter.

¶ 12 With respect to Appellant's second claim, we previously noted that the trial court entered a nonsuit in response to Dr. Morros' motion *in limine*. The same procedure was utilized by the trial judge and the litigants in *Lewis v. United Hospitals, Inc.*, 547 Pa. 626, 629, 692 A.2d 1055, 1056–1057 (1997). On appeal, our Supreme Court held that it was improper for the trial court to enter a nonsuit before the trial began and before the plaintiff had presented any evidence as to the defendant's liability. *Id.*, 547 Pa. at 631, 692 A.2d at 1058. The Supreme Court suggested, as an alternative, that the trial court should have treated the defendant's motion as a request for summary judgment or motion for judgment on the pleadings. *Id.*, 547 Pa. at 631–632, 692 A.2d at 1058.

¶ 13 Appellant characterizes Dr. Morros' motion as a request for summary judgment. *See* Appellant's Brief on Reargument at 23–24 n. 6. Dr. Morros has not objected to this procedure. Given the parties' agreement and, in light of our Supreme Court's directive in *Lewis*, we will regard her second contention as involving the grant of summary judgment. As both of Appellant's claims will be viewed as involving the trial court's grant of summary judgment, we apply the following scope and standard of review:

> In examining this matter, as with all summary judgment cases, we must view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. In order to withstand a motion for summary judgment, a non-moving party must adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof such that a jury could return a verdict in his favor. Failure to adduce this evidence establishes that there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law. Finally, we stress that summary judgment will be granted only in those cases which are clear and free from doubt. Our scope of review is plenary.

*Washington v. Baxter*, 553 Pa. 434, 441, 719 A.2d 733, 737 (1998) (citations and quotation marks omitted). *Accord Southard v. Temple University Hospital*, 731 A.2d 603, 609–610 (Pa.Super.1999); *Grabowski v. Quigley*, 454 Pa.Super. 27, 34–36, 684 A.2d 610, 614 (1996), *appeal dismissed as having been improvidently granted*, 553 Pa. 75, 717 A.2d 1024 (1998).

¶ 14 With regard to Appellant's first issue, the general rule in Pennsylvania is that, under normal circumstances, only the physician who performs the operation on the patient has the duty of obtaining the patient's informed consent. *Boutte v. Seitchik*, 719 A.2d 319, 325 (Pa.Super.1998). Hospitals generally have no duty to a patient under the informed consent doctrine. *Southard*, 731 A.2d at 614. This Court therefore has repeatedly rejected attempts to impose direct liability upon a hospital for failing to obtain a patient's informed consent. *See, e.g., Watkins v. Hospital of the University of Pennsylvania*, 737 A.2d 263, 268–269 (Pa.Super.1999); *Southard*, 731 A.2d at 614; *Kelly v. Methodist Hospital*, 444 Pa.Super. 427, 431–435, 664 A.2d 148, 150–151 (1995).

¶ 15 However, this Court carved out an exception to the general rule in *Friter v. Iolab Corp.*, 414 Pa.Super. 622, 607 A.2d 1111 (1992). *Friter* held that the hospital was directly liable for failing to obtain the patient's informed consent because it had specifically assumed the duty to obtain the patient's consent as a part of a clinical investigation conducted under the auspices of the United States Food and Drug Administration (FDA). *Friter*, 607 A.2d at 1113–1115. Unlike the situation in *Friter*, the aortogram here was not conducted as part of a clinical study subject to FDA requirements. Nor did AEMC oth-

erwise specifically assume a duty to obtain Mr. Valles' informed consent, as did the hospital in *Friter*. The exception in *Friter* thus does not apply here.

¶ 16 Appellant acknowledges the above caselaw and points out that she is seeking to impose vicarious rather than direct liability on AEMC. Appellant's Brief on Reargument at 15. We note that this Court has recently rejected a virtually identical claim. *Watkins*, 737 A.2d at 268–269. Neither of the parties cite or discuss *Watkins*. While *Watkins* did not articulate the basis for its reasoning other than to review the above caselaw involving the imposition of direct liability, *see Watkins*, *supra*, we are nonetheless persuaded that the result reached therein is correct.

■■■ ¶ 17 It is well settled that an employer is vicariously liable for the negligent acts of his employee which cause injuries to a third-party, provided that such acts were committed during the course of and within the scope of the employment. *Costa v. Roxborough Memorial Hospital*, 708 A.2d 490, 493 (Pa.Super.1998), *appeal denied*, 556 Pa. 691, 727 A.2d 1120 (1998). In certain circumstances, an employer's vicarious liability may also extend to intentional or even criminal acts committed by the employee. *Id.* However,

> not every relationship of principal and agent creates vicarious responsibility in the principal for the acts of the agent. A principal and agent can be in the relationship of a master and servant, or simply in the status of two independent contractors. If a particular agent is not a servant, the principal is not considered a master who may be held vicariously liable. . . .
>
> In determining whether the . . . relationship [is] one of master and servant or simply that of two independent con-

tractors . . . the basic inquiry is whether such person is subject to the alleged employer's control or right to control with respect to his physical conduct in the performance of the services for which he was engaged. The hallmark of an employee-employer relationship is that the employer not only controls the result of the work but has the right to direct the manner in which the work shall be accomplished; the hallmark of an independent contractee-contractor relationship is that the person engaged in the work has the exclusive control of the manner of performing it, being responsible only for the result.

*Myszkowski v. Penn Stroud Hotel, Inc.*, 430 Pa.Super. 315, 319–322, 634 A.2d 622, 625–626 (1993) (citations and quotation marks omitted). While control of the work is an important factor, other considerations include: the nature of the work or occupation; skill required for performance; whether one employed is engaged in a distinct occupation or business; which party supplies the tools; whether payment is by the time or by the job; whether work is part of the regular business of the employer; and the right to terminate the employment at any time. *Shafer v. State Employes' Retirement Board*, 548 Pa. 320, 333–334, 696 A.2d 1186, 1192 (1997). None of the factors is dispositive of a person's status as an employee and each case must be determined on its own facts. *Id.*, 548 Pa. at 334, 696 A.2d at 1192.

¶ 18 In this case, the parties' arguments focus on the element of control.[10] Appellant's Supplemental Brief on Reargument, at 8–10; AEMC's Brief at 13–14. Neither party has supplied us with a copy of Dr. Allen's employment contract or other materials bearing on the above factors. Appellant instead suggests that we may infer

---

10. Appellant also asserts that AEMC waived its right to challenge the master-servant issue by failing to raise it in the trial court. Appellant's Reply Brief on Reargument, at 1–2. Contrary to Appellant's assessment, AEMC did raise the issue of control, which directly implicates the master-servant relationship, in

its memorandum in support of its motion for summary judgment. AEMC's Memorandum of Law in Support of Motion for Summary Judgment, at 16. We decline to find waiver merely because the trial court chose not to conduct a thorough analysis and address this matter.

the existence of a master-servant relationship based on the fact that Dr. Allen was an employee of AEMC. Appellant's Supplemental Brief on Reargument, at 5 and 7. This we decline to do.

¶ 19 While we agree with Appellant that AEMC had a duty to generally oversee Dr. Allen, nothing in the record indicates that AEMC exercised control over the manner in which he was to perform radiology work, such as the aortogram. We fail to see how AEMC could conduct such oversight, absent having another physician present, in light of the fact that the procedure in question is of a highly specialized nature and requires specific skills, education and training in order to be performed. Oversight by AEMC would thus inject the hospital into the physician-patient relationship. Such a situation would be improvident and unworkable as it would create potential conflicts between the hospital and its physician and between the physician and his or her patient. As Judge Tamilia cogently noted:

It is the surgeon and not the hospital who has the education, training and experience necessary to advise each patient of [the] risks associated with the proposed surgery. Likewise, by virtue of his relationship with the patient, the physician is in the best position to know the patient's medical history and to evaluate and explain the risks of a particular operation in light of the particular medical history. Appellant['s] attempt to impose upon a hospital the duty not only to ensure that physicians obtain informed consent but also to draft the substantive information to be disclosed, ignores these unique aspects of the physician-patient relationship.

*Kelly*, 664 A.2d at 151 (quotation marks omitted). For these reasons we hold, as a matter of law, that a hospital cannot be held vicariously liable for the failure of its physicians to obtain a patient's informed consent. Because AEMC is not vicariously liable for Dr. Allen's failure to obtain Mr. Valles' informed consent, summary judgment was properly entered.

¶ 20 Appellant's remaining contention pertains to Dr. Morros. In addressing this claim, we note that Appellant does not challenge the propriety of the information that was actually relayed to Mr. Valles by Dr. Wladis. Rather, it is Appellant's position that Dr. Morros was required to additionally advise Mr. Valles of alternate sites for placement of the catheter. Appellant's Brief on Reargument at 25–28. With regard to the question of informed consent, this Court has stated:

Pennsylvania law requires a physician, in a non-emergency situation, to obtain a patient's informed consent prior to performing a surgical procedure if the patient is mentally and physically able to discuss his or her medical condition. Pennsylvania's informed consent doctrine is based on a prudent patient standard and courts, therefore, must examine informed consent issues from the perspective of the patient, not of the physician.

Thus, for a patient's consent to be informed, a physician must disclose to the patient the material facts, risks, complications and alternatives to surgery, which a reasonable man in the patient's position would have considered significant in deciding whether to have the operation . . . .

*Perkins v. Desipio*, 736 A.2d 608, 609–610 (Pa.Super.1999) (citations and quotation marks omitted).

¶ 21 In applying the above principles, the appellate courts have struggled to define the procedures and practices which implicate informed consent. For example, the appellate courts have declined to extend the doctrine to include the administration of drugs, use of tools or other non-surgical practices. *See, e.g., Sinclair by Sinclair v. Block*, 534 Pa. 563, 569–571, 633 A.2d 1137, 1140–1141 (1993) (informed consent does not apply to the natural delivery process, which is not a surgical or operative procedure; doctor thus does not have to obtain patient's consent to utilize a forceps in delivering a child); *Hoffman v.*

*Brandywine Hospital,* 443 Pa.Super. 245, 252–254, 661 A.2d 397, 401 (1995) (discussing cases in which the courts declined to apply the informed consent doctrine to the administration of therapeutic drugs or radiation treatments). The doctrine thus has been confined to surgical procedures. *Perkins,* 736 A.2d at 610 (noting that informed consent doctrine traditionally has been limited to surgical or operative procedures). Within the context of surgical or operative procedures, this Court has held that informed consent applies to the implantation of surgical devices. *Southard,* 731 A.2d at 611–613; *Stover v. Association of Thoracic and Cardiovascular Surgeons,* 431 Pa.Super. 11, 19–27, 635 A.2d 1047, 1051–1054 (1993). We have likewise intimated that informed consent may encompass the method of surgically inserting a medical device. *Hoffman,* 661 A.2d at 401; *Stover,* 635 A.2d at 1054.

■ ¶ 22 The language set forth in *Stover,* which was reiterated in *Hoffman,* is nothing more than *dicta,* as the surgical method in which the device/substance was implanted/injected was not at issue in either case.[11] *See Lewis v. Erie Insurance Exchange,* 2000 Pa.Super. 160, ¶29, 753 A.2d 839, 849 (2000) (providing that a statement that was unnecessary to the disposition of a case constitutes *dicta*). Although *dicta* does not constitute binding precedent, *see id.,* it is nonetheless entitled to consideration. We are persuaded that the reasoning in *Hoffman* and *Stover* was correct.

■ ¶ 23 The doctrine of informed consent encompasses the entire surgical treatment and all of its recognized and material risks. *Stover,* 635 A.2d at 1054. The manner or method of surgery falls within the rubric of surgical treatment. It is certainly not difficult to envision situations in which the manner of surgery may be of critical importance. For example, a

patient may prefer to minimize scarring. *See, e.g., Boutte,* 719 A.2d at 325 (noting that patient desired to have a "normal appearance" following mastectomy and reconstructive surgery). Other patients might be concerned with recuperation time or the impact that the surgery will have on the patient's lifestyle. In such cases, the method or manner in which the procedure is conducted may well be of critical importance in deciding whether to undergo the surgery. We therefore hold that informed consent applies to the method or manner of surgery and the risks associated therewith.

■ ¶ 24 Our conclusion does not require a physician to apprise a patient of every minute detail concerning the surgical implantation of a medical device. Rather, the patient need only be apprised of such material information as is necessary to determine whether to proceed with the surgical or operative procedure or remain in the present condition. *Sinclair,* 534 Pa. at 570, 633 A.2d at 1140. As we stated in *Stover :*

> Under our view of the doctrine of informed consent, a physician would need to discuss alternate prostheses and their relative merits only when the other prostheses represent medically recognized alternatives. In such happenstance, the patient is entitled to weigh the risks of the alternative treatments. When, however, there are no other medically recognized alternate prostheses, or, for that matter, any other medically recognized alternate treatments, the doctor need only discuss with the patient any risks relative to the sole, viable prosthesis [or treatment.]

*Stover,* 635 A.2d at 1051. These comments are equally applicable to the method or manner of implanting a device. Consequently, a physician is only required to inform the patient of those medically rec-

---

11. In *Hoffman,* it was asserted that the physician failed to obtain the patient's informed consent before administering blood transfusions. *Hoffman,* 661 A.2d at 400. *Stover* involved the implantation of mechanical heart valves and the physician's failure to apprise the patient of alternate types of valves and the risks attendant to each. *Stover,* 635 A.2d at 1049–1051.

ognized or medically viable alternate methods of implanting a device. Where there are no other alternate methods, only the sole, viable procedure needs to be discussed.

¶ 25 In the context of this case, there is no dispute that there were six routinely medically recognized sites utilized for the placement of the catheter: the left and right femoral veins; the right and left internal jugular veins; and the right and left subclavian veins. Deposition of Dr. Jay Morros, 4/15/96, at 23 and 47 (hereinafter Morros Deposition); Deposition of Dr. Michael Leitman, 6/25/98, at 64–65 (hereinafter Leitman Deposition). The issue thus hinges on whether any site, other than the right subclavian vein, was viable in light of Mr. Valles' particular condition.

¶ 26 With regard to this issue, Dr. Morros testified at his deposition that a left subclavian catheter previously was implanted in Mr. Valles for dialysis purposes. Morros Deposition at 30. Unfortunately, Mr. Valles developed an infection at this site, necessitating the removal of the catheter. Id. at 30. In addition, testing revealed the presence of a deep obstruction in the left subclavian vein. Id. at 30–32. For these reasons, he believed that the left subclavian and left jugular veins did not present viable alternatives. Id. at 48 and 53. Dr. Morros similarly decided to avoid either of the femoral veins as these areas were prone to infection and, given Mr. Valles' prior incidence of bacteremia, Dr. Morros wanted to avoid further infection. Id. at 50 and 52–53.

¶ 27 Finally, Dr. Morros eliminated the right internal jugular vein as a viable option because a catheter previously was placed at this site and scarring could result if this location was again utilized. Id. at 54. Dr. Morros was also concerned that Mr. Valles might require a tracheotomy, given his prior history of being placed on a respirator. Id. In addition, placement of the catheter in the neck area would reduce Mr. Valles' mobility and the catheter would be more stable if placed in the right subclavian vein. Id.

¶ 28 Appellant did not present any evidence demonstrating a disputed issue of fact that alternate viable sites existed for placement of the catheter. Appellant's expert, Dr. I. Michael Leitman, indicated that it was less desirable to place a catheter at a site in which a catheter was previously placed and that he preferred to use a site that had not been utilized before to avoid the possibility of scarring, infection or a blood clot. Leitman Deposition, at 119–120. Dr. Leitman further indicated that in the event a tracheotomy had to be performed, the internal jugular vein would not be an optimal site. Id. at 156. Although Dr. Leitman opined that the right femoral vein was a viable site in this case, id. at 159, he also stated that the jugular or subclavian vessels were preferable to the femoral sites and that femoral veins should not be utilized if the catheters were to remain in place for an extended period of time. Id. at 136–137. Most importantly, Dr. Leitman agreed with Dr. Morros that he would not discuss possible sites for placement of a catheter if, in the exercise of his medical judgment, he determined that the site did not present a viable option in light of the patient's particular health concerns. Id. at 157–159.

¶ 29 Comparison of Dr. Leitman's and Dr. Morros' testimony thus reveals that there is no genuine issue of disputed fact that the femoral, jugular and left subclavian sites did not present viable alternatives for implantation of the catheter in light of Mr. Valles' history and particular health considerations. Because Appellant failed to demonstrate the existence of a disputed issue of material fact, summary judgment was properly entered in favor of Dr. Morros. Finding that no relief is due, we affirm.

¶ 30 Order affirmed.

¶ 31 DEL SOLE, J., files Dissenting Opinion in which McEWEN, President Judge, and TODD, J., join.

¶ 32 MUSMANNO, J., files Concurring and Dissenting Opinion.

DEL SOLE, J., Dissenting:

¶ 1 I respectfully dissent from the Majority's ruling that summary judgment was appropriate in this matter. Upon review I believe both the vicarious liability claim against Albert Einstein Medical Center (AEMC) and the informed consent claim against Dr. Morros with regard to the placement of Mr. Valles' catheter should go forward to a jury.

¶ 2 The Majority recognizes, that as a general rule, the physician who performs a procedure has the duty to obtain the patient's informed consent. Majority Opinion at 1243; *Boutte v. Seitchik*, 719 A.2d 319 (Pa.Super.1998). This rule exists because a physician who fails to obtain a patient's informed consent is responsible for the intentional tort of battery.[12] *Stover v. Surgeons*, 431 Pa.Super. 11, 635 A.2d 1047 (1993). The physician's duty in these circumstances is non-delegable. The duty rests with the physician, and the hospital in which the procedure is performed is not vicariously liable if the physician breaches that duty, provided the physician is not an employee of the hospital. Also, where the hospital, by its employee, undertakes the responsibility to obtain a patient's informed consent, the hospital is vicariously liable if its employee is negligent in failing to fully inform the patient.

¶ 3 Appellant contends AEMC is vicariously liable for the failure of its employee to obtain Mr. Valles' informed consent prior to performing the aortagram. In this case, Dr. Gordon, a resident of the hospital's radiology department, sought to obtain Mr. Valles' consent. The aortagram was then performed by Dr. Allen, also an employee of AEMC. Dr. Allen, the person responsible for performing the procedure, remained the party responsible for a technical battery in the absence of obtaining the patient's informed consent. In my view the hospital can be vicariously liable for the actions of Dr. Allen, its employee, who was alleged to have performed a procedure without the necessary consent. A separate claim for negligence for failing to obtain informed consent can be made against hospital employee, Dr. Gordon. Dr. Gordon, who did not perform the procedure, cannot be responsible for a technical battery and can only be responsible under a theory of negligence. The hospital, as Dr. Gordon's employer, can then be held vicariously liable for her negligence.

¶ 4 Our Supreme Court in *Tonsic v. Wagner*, 458 Pa. 246, 253, 329 A.2d 497, 501 (1974), ruled that agency law principles applicable to others should also apply to hospitals. It recognized that hospitals owe a duty to the patient and if a servant breaches that duty, the master may be liable. The court concluded a hospital could be liable for the negligence of its personnel during an operation. Likewise, the hospital in this case can be liable for the negligent and the intentional torts of its employees.

¶ 5 The Majority recognizes that an employer's vicarious liability may extend to the intentional or criminal acts of the employee, but finds nothing in the record indicating the hospital exercised control over the manner in which Dr. Allen was to perform his radiology work. However, the hospital did have control over Dr. Allen. He was its employee and was performing his duties at the time of the procedure. He was acting on the premises of his employer and engaged in his work as a physician. While the hospital may not oversee every aspect of his surgical duties and yet be vicariously liable for his negligence, likewise it can be vicariously liable for the battery he committed due to his failure to obtain informed consent. Accordingly, I would allow this claim to go forward to a jury.

12. While this remains the law of this Commonwealth, it has consistently been questioned whether the battery theory should be abandoned in favor of a negligence standard. See *Morgan v. McPhail*, 449 Pa.Super. 71, 672 A.2d 1359 (1996); *Malloy v. Shanahan*, 280 Pa.Super. 440, 421 A.2d 803, 805 (1980) (dissenting opinion by Hoffman, J.) (citing cases); and *Hoffman v. Brandywine Hospital*, 443 Pa.Super. 245, 255 n. 3, 661 A.2d 397, 402 n. 3 (1995).

¶ 6 The second issue concerns the actions of Dr. Morros and a claimed failure to obtain informed consent regarding the insertion of a catheter. With regard to this issue, which questions a physician's duty to advise a patient of alternative methods of performing an invasive procedure, I agree with the Majority that the doctrine of informed consent encompasses the entire surgical treatment including the method and manner of surgery. Where more than one medically recognized viable alternate method of a procedure is an option for a patient, the patient should be advised of those options and their attending risks.

¶ 7 However, I dissent from the Majority's conclusion that there is no disputed issue of fact in this case regarding the alternate viable sites for placement of the catheter. The Majority cites extensively from the testimony offered by Dr. Morros given at his deposition. However, Dr. Morros' oral testimony can not be the basis for summary judgment in his favor, even if that testimony is uncontradicted and unimpeached, because the credibility of the witnesses is always for the jury to assess. *Savidge v. Metropolitan Life Insurance Company*, 380 Pa. 205, 110 A.2d 730 (1955); *Nanty–Glo v. American Surety Co.*, 309 Pa. 236, 163 A. 523 (1932).

¶ 8 The Majority claims Appellant did not offer evidence to establish that other viable alternative sites existed in this case. In fact, the testimony of Appellant's expert Dr. Leitman did provide such evidence. Dr. Leitman was asked whether, if in his best medical judgment he determined there were no medically viable alternative sites for placement of the catheter, would he still give the patient a choice of options. Dr. Leitman responded that he would not. Leitman Deposition, at 159. He was then asked the following question, and responded:

Q. Doctor, in this case with Mr. Valles, having gone through all this testimony today, was the right femoral vein a viable alternative site?

A. Yes.

*Id.*

¶ 9 In my view this testimony alone creates a question for the jury to consider whether, as Appellant's expert suggests, a viable alternative site for placement of the catheter existed. Accordingly, I dissent from Majority's decision to affirm an award of summary judgment in this matter.

MUSMANNO, J., Concurring and Dissenting:

¶ 1 I agree with the majority that Albert Einstein Medical Center (AEMC) is not vicariously liable for Dr. Allen's failure to obtain informed consent. Because a hospital generally has no duty to a patient under the informed consent doctrine, *see Southard v. Temple Univ. Hosp.*, 731 A.2d 603, 614 (Pa.Super.1999), I concur with the majority's conclusion that summary judgment properly was entered in favor of AEMC and against Appellant regarding this issue.

¶ 2 With respect to the majority's determination that the informed consent doctrine did not require Dr. Morros to advise the decedent regarding alternative viable sites for placement of the catheter, I respectfully dissent from the majority and join the dissenting opinion of my esteemed colleague, the Honorable Joseph Del Sole.