important" matters—when we entertain claims for which there has been no prior appellate review.

Esmelinda VALLES, Administratrix of the Estate of Lope Valles, Deceased; Ruben Valles, Appellant

v.

ALBERT EINSTEIN MEDICAL CENTER; Leonard H. Cohen, M.D.; Archimede J. Silvestri, M.D.; Paul H. Steerman, M.D.; A. Silvestri Associates; Jay Morros, M.D.; Mark Kramer, M.D.; and Alan Wladis, M.D.,

Jay Morros, M.D., Cross–Appellant.

Supreme Court of Pennsylvania.

Argued Oct. 16, 2001.
Decided Aug. 28, 2002.

Saylor, J., concurred in part, dissented in part, and filed opinion.

Nigro, J., dissented and filed opinion in which Saylor, J., joined in part.

Jonathan Alan Briskin, Pamela E. Lewis, Bryn Mawr, for Esmelinda Valles.

Michael G. Sabo, Daniel N. German, Philadelphia, for Albert Einstein Medical Center.

Marion Henry Griffin, for Jay Morros, M.D.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

### OPINION

Justice CAPPY.

We granted allocatur in order to address several issues regarding the scope of the informed consent doctrine. The Superior Court affirmed the entry of summary judgment in favor of Appellee Albert Einstein Medical Center ("AEMC") and Cross–Appellant Jay Morros, M.D. ("Morros"). For the reasons set forth herein, we affirm the order of the Superior Court.

We view the facts in the light most favorable to Appellant Esmelinda Valles, as the non-moving party. *Murphy v. Duquesne Univ. of the Holy Ghost,* 565 Pa. 571, 777 A.2d 418, 429 (2001). Appellant's claims arise from two separate medical procedures performed upon her brother, Lope Valles ("Valles").[1] On November 14, 1992, Valles, a diabetic, was admitted to AEMC for a suspected abdominal aortic aneurysm[2]. An aortogram[3] was sched-

---

1. Ruben and Esmelinda Valles, Valles' brother and sister, respectively, commenced the action as administrators of his estate; Ruben was subsequently removed as a plaintiff.

2. An aneurysm is a dilation of a portion of an artery. *See* STEDMAN'S MEDICAL DICTIONARY at 79 (27th ed.2000).

3. An aortogram is the image resulting from radiographic imaging of the aorta and its branches, or a portion of the aorta, by injec-

uled to study the location of the aneurysm. Muriel Gordon, M.D., a radiology resident at AEMC, obtained Valles' written consent to undergo the procedure scheduled to be performed by Steven Allen, M.D. ("Allen"), a radiologist at AEMC. While the written consent does not disclose the risk of renal damage or alternatives to the procedure, Allen indicated that it was his custom to inform a patient undergoing this procedure that the dye from the aortagram might damage the kidneys. After the procedure was performed on November 19, 1992, Valles' kidney functions worsened. Surgery to repair the aneurysm was postponed and Valles was discharged on November 24, 1992. On December 8, 1992, Valles was again admitted to AEMC suffering from renal failure. On December 17, 1992, the aneurysm was successfully repaired.

Given Valles' need for extended dialysis and prior complications with a short-term catheter, doctors recommended placement of a different catheter (the "Permacath"), which was suitable for longer periods of dialysis. Morros was scheduled to perform the surgical placement of the Permacath. On January 6, 1993, Alan Wladis, M.D., a surgical resident at AEMC, obtained Valles' written consent for the procedure. Wladis advised Valles of certain risks involved in the insertion of the Permacath, including bleeding, infection, collapsing of a lung and death. While the Permacath can be placed at several sites, including the jugular (neck) veins, the subclavian (chest) veins, or the femoral (groin) veins, Wladlis did not know at which site the catheter would be inserted and did not advise Valles as to where the catheter would be placed.

On January 7, 1993, Morros attempted to insert the Permacath into Valles' right subclavian vein. During the procedure, Valles suffered a hemopneumothorax[4] and cardiac arrest. Thereafter, Valles remained comatose and subsequently died on January 16, 1993.

Appellant filed a complaint against AEMC, Morros and others. The claim against AEMC was premised, *inter alia*, upon a theory of vicarious liability for the battery committed by Allen due to his failure to obtain informed consent prior to performing the aortogram. Appellant contends that Valles was not properly advised of the risks of the use of contrast dye and alternatives to the aortogram. In support of this claim, Appellant's expert opined that there were alternatives to the aortogram; that the risks to Valles of contrast-induced renal failure were significant (10–20%) and that Valles' renal failure was caused by the aortogram.

The claim against Morros was also based on a lack of informed consent to the catheter procedure Morros performed. Appellant claims that Valles was not advised of the alternative placement sites for the Permacath and risks relative to those sites. Appellant's expert opined that use of the alternative sites would have lessened or eliminated the risks of the complication that developed during the attempted insertion of the Permacath. The expert further indicated that the attempted placement of the catheter in the right subclavian vein resulted in the complications that led to Valles' death.

AEMC moved for summary judgment. Morros filed a motion in limine in which he sought to preclude Appellant from pursuing any claims relating to informed con-

---

tion of contrast medium, ultrasound or magnetic resonance. *See* STEDMAN'S MEDICAL DICTIONARY at 108 (27th ed.2000).

4. A hemopneumothorax is "[a]ccummulation of air and blood in the pleural [chest] cavity." STEDMAN'S MEDICAL DICTIONARY at 805 (27th ed.2000).

sent. The trial court granted AEMC's motion but denied Morros' motion, leaving Morros as the only remaining defendant.[5] Prior to jury selection, Morros renewed his motion, which a different trial judge granted and thereafter dismissed the claim.[6]

On appeal, a panel of the Superior Court unanimously affirmed the trial courts' orders. Following reargument, a divided en banc panel affirmed. *Valles v. Albert Einstein Medical Center et al.*, 758 A.2d 1238 (Pa.Super.2000). With regard to the aortogram performed by Allen, a majority of the *en banc* panel concluded that AEMC could not be held vicariously liable for Allen's failure to obtain informed consent. The court determined that nothing in the record indicated that AEMC exercised control over the manner in which Allen was to perform radiology work. The court relied on *Kelly v. Methodist Hospital*, 444 Pa.Super. 427, 664 A.2d 148 (1995), wherein the Superior Court determined that a hospital could not be held liable under a theory of corporate negligence based on its failure to promulgate policies and procedures relating to informed consent. The court in *Kelly* reasoned that the surgeon was in the best position to advise each patient of such risks, and it would be unworkable to have the hospital draft the forms imparting the substantive information relative to each procedure. *Id.* at 151. Similarly, in this case, the Superior Court reasoned that oversight of a highly specialized procedure such as an aortogram would improperly inject the hospital into the physician-patient relationship and would be unworkable.

As to the claim against Morros based on the placement of the Permacath, the court determined that "informed consent applied to the method or manner of surgery and the risks associated therewith." 758 A.2d at 1246. The court further concluded that "a physician is only required to inform the patient of those medically recognized or medically viable alternate methods of implanting a device." *Id.* at 1246–47. The court recognized that there are typically six alternative sites for placement of the catheter but after reviewing the relevant testimony, concluded that none of these alternative sites were viable given Valles' condition. The court therefore affirmed the dismissal of the claim against Morros.

Judge Del Sole filed a dissenting opinion, joined by Judges McEwen and Todd. Judge Del Sole asserted that AEMC could be held vicariously liable as Allen was its employee. As to the claim against Morros, Judge Del Sole agreed with the majority that the informed consent doctrine encompasses the method and manner of surgery, but he determined that there was a disputed issue of fact regarding the alternate viable sites. Judge Musmanno filed a concurring and dissenting opinion. He agreed with the majority that the hospital could not be held vicariously liable, but joined the dissenting opinion of Judge Del Sole with respect to the informed consent claim against Morros.

■ This court granted allocatur to address issues raised by Appellant Valles and Cross–Appellant Morros. Appellant raises the following issues: (1) whether a hospital can be held vicariously liable as a

---

5. All other defendants had been dismissed by this point.

6. The trial court entered a nonsuit in Morros' favor. Procedurally, this order was improper, as the jury had not yet heard any evidence. *Lewis v. United Hospitals, Inc.*, 547 Pa. 626,

692 A.2d 1055, 1056–57 (1997); Pa.R.C.P. 230.1. Instead, the trial court should have treated the motion as a request for summary judgment or a motion for judgment on the pleadings. 692 A.2d at 1058. Both Morros and Appellant treat the motion as one for summary judgment, and we do the same.

matter of law for its employee-physician's failure to obtain informed consent; (2) whether, in an informed consent case, there exists a disputed issue of material fact precluding a grant of summary judgment in the defendant physician's favor when plaintiff's expert disagrees with the defendant physician regarding the medical viability of a surgical approach. In his cross-appeal, Morros asks us to resolve whether the Superior Court erred in determining that the doctrine of informed consent requires surgeons to discuss treatment techniques in addition to treatment alternatives.[7]

We first address Appellant's contention that AEMC should be held vicariously liable for Allen's failure to obtain Valles' informed consent prior to performing the aortogram. Appellant asserts under principles of respondeat superior, a hospital may be vicariously liable for its employee-physician's intentional torts, including the failure to obtain informed consent. Because a hospital has an obligation to oversee all persons who practice medicine within its walls, Appellant maintains that the hospital as an employer and health care provider in its own right maintains a right

of control in the relationship sufficient to justify the imposition of liability.[8]

Appellee responds that historically in Pennsylvania, the duty to obtain informed consent rests only with the physician performing the surgical procedure, except in limited circumstances not present here. Thus, a medical facility such as AEMC cannot be held vicariously liable for the physician's failure to perform this non-delegable duty.

Although this is an issue of first impression for this court, the Superior Court has addressed vicarious liability for a physician's failure to obtain informed consent in two cases, with different results. *See Grabowski v. Quigley*, 454 Pa.Super. 27, 684 A.2d 610 (1996) (defendant-physician who directed second physician to perform surgery could be held vicariously liable for unauthorized surgery), *appeal dismissed as improvidently granted*, 553 Pa. 75, 717 A.2d 1024 (1998); *Watkins v. Hospital of the Univ. of Penn., Penn Health Systems*, 737 A.2d 263 (Pa.Super.1999) (hospital could not be held vicariously liable because as a general rule, there is no independent duty for a non-physician to obtain a patient's informed consent).[9]

---

7. Our review on an appeal from the grant of a motion for summary judgment is well-settled. Summary judgment may be granted only in those cases in which the record clearly shows that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *P.J.S. v. Penn. State Ethics Comm'n*, 555 Pa. 149, 723 A.2d 174, 176 (1999). A reviewing court may disturb the order of the trial court only where it determines that the court committed an error of law or abused its discretion. *Capek v. Devito*, 564 Pa. 267, 767 A.2d 1047, 1048 n. 1 (2001). As this appeal presents questions of law, our review is plenary. *Phillips v. A–Best Products Co.*, 542 Pa. 124, 665 A.2d 1167, 1170 (1995).

8. Appellant clarifies that she is not contending that AEMC had an independent duty to

obtain consent, nor that AEMC was negligent under a theory of corporate liability for failing to ensure that informed consent was obtained. Therefore, this opinion in no way opines on any other theories other than the hospital's vicarious liability.

9. The court noted one exception, enunciated in *Friter v. Iolab Corp.*, 414 Pa.Super. 622, 607 A.2d 1111 (1992), in which a hospital was held liable for the lack of informed consent because the hospital was involved in a clinical investigation for the Food and Drug Administration. Federal regulations required the hospital to obtain the informed consent of any patient participating in the study. Thus, the hospital assumed an independent duty to obtain the patient's informed consent. Appellant does not allege that AEMC has similarly assumed an independent duty in this case.

Appellant further contends that the Superior Court erred in relying on *Kelly*, as the decision in that case to reject a theory of corporate negligence conflicts with this court's decision in *Tonsic v. Wagner*, 458 Pa. 246, 329 A.2d 497 (1974). In *Tonsic*, this Court determined that agency principles apply to hospitals, and that a hospital can be held liable for negligent acts of its employee-physicians. *Id.* at 501. *See also Thompson v. Nason Hosp.*, 527 Pa. 330, 591 A.2d 703, 707 (1991) (*Tonsic* recognized respondeat superior as a basis for hospital liability). Appellant urges us to follow the holding of *Grabowski*, and reject the reasoning of *Watkins* and *Kelly*.

▮▮▮ Resolution of Appellant's first issue necessarily entails a discussion of the principles of informed consent and vicarious liability. In a claim alleging lack of informed consent, it is the conduct of the unauthorized procedure that constitutes the tort. *Moure v. Raeuchle*, 529 Pa. 394, 604 A.2d 1003, 1008 (1992). A claim of a lack of informed consent sounds in the intentional tort of battery because an operation performed without the patient's consent is deemed to be the equivalent to a technical assault. *Smith v. Yohe*, 412 Pa. 94, 194 A.2d 167, 174 (1963). To obtain a patient's informed consent, doctors must provide patients with "material information necessary to determine whether to proceed with the surgical or operative procedure or to remain in the present condition." *Duttry v. Patterson*, 565 Pa. 130, 771 A.2d 1255, 1258 (2001) (*quoting Sinclair by Sinclair v. Block*, 534 Pa. 563, 633 A.2d 1137, 1140 (1993)). This information must give the patient "a true understanding of the nature of · the operation to be performed, the seriousness of it, the organs of the body involved, the disease or

incapacity sought to be cured, and the possible results." *Id.* (*quoting Gray v. Grunnagle*, 423 Pa. 144, 223 A.2d 663, 674 (1966)). While doctors are not required to disclose "all known information," they are required to "advise the patient of those material facts, risks, complications and alternatives to surgery that a reasonable person in the patient's situation would consider significant in deciding whether to have the operation." *Gouse v. Cassel*, 532 Pa. 197, 615 A.2d 331, 334 (1992) (emphasis omitted).[10]

▮▮▮ Vicarious liability is at issue because of the alleged master-servant relationship between Allen and AEMC. As a general rule, a master may be held liable for the acts of the servant when those acts are committed during the course of his employment and within the scope of his authority. *Lunn v. Boyd*, 403 Pa. 231, 169 A.2d 103 (1961). A master may be vicariously liable even in the case of assaults committed by the servant. *See Orr v. William J. Burns Int'l Detective Agency*, 337 Pa. 587, 12 A.2d 25 (1940).

▮▮▮ This court has previously examined the contours of the employer/employee relationship. *Shafer v. State Employes' Retirement Bd.*, 548 Pa. 320, 696 A.2d 1186 (1997). We consider numerous factors to determine whether a person is an employee:

Control of manner work is to be done; responsibility for result only; terms of agreement between the parties; the nature of the work or occupation; skill required for performance; whether one employed is engaged in a distinct occupation or business; which party supplies the tools; whether payment is by the time or by the job; whether work is part

---

**10.** The General Assembly has recently codified the law of informed consent. *See* 40 P.S. § 1301.811–A (repealed and recodified as amended, 40 P.S. § 1303.504). Those provisions are inapplicable to the instant matter as they became effective after the procedures at issue here.

of the regular business of the employer, and also the right to terminate the employment at any time.

*Id.* at 1192 (quoting *Zimmerman v. Public School Employes' Retirement Bd.*, 513 Pa. 560, 522 A.2d 43, 45 (1987)). We further indicated that "[n]one of these factors is absolutely dispositive of a person's status as an employee and each case must be determined on its own facts." *Id.* (citing *Budzichowski v. Bell Telephone Co. of Penn.*, 503 Pa. 160, 469 A.2d 111, 113 (1983)).

■ Appellant contends that the Superior Court's determination that AEMC lacked the requisite control over Allen conflicts with our prior decision in *Budzichowski, supra.* In that case, a plant worker sought damages for injuries allegedly caused by negligent medical diagnosis and treatment received from the plant's medical dispensary physicians. We held that the physicians were "employees" for purposes of the Workers' Compensation Act, and therefore were immune from liability as "fellow employees" of the plaintiff. As to the issue of control, we stated that "[a]n employer-employee relationship may be found even though 'a particular occupation may involve such technical skill that the employer is wholly incapable of supervising the details of performance.'" (citing *Babich v. Pavich*, 270 Pa.Super. 140, 411 A.2d 218 (1979)). The evidence demonstrated that both physicians worked a 40–hour week in the dispensary, and did not engage in any other medical practice. Moreover, they were under the direct supervision of the employer's medical director who had the authority to direct the type, manner and extent of treatment of any patient and could transfer patients from the care of any doctor in the dispensary.[11]

Unlike the plaintiff in *Budzichowski* and similar cases cited by amicus, Appellant points to little record evidence to support her claim that Dr. Allen was an employee of AEMC. As the Superior Court noted, Appellant has not presented any employment agreement between Dr. Allen and AEMC. Instead, Appellant generally cites the control that a hospital maintains when it employs a physician, including: its provision of the instrumentalities, place to work, support staff, patient base and wages; its right to require the employee's presence at a particular time and to terminate employment; its retention of revenues for the employee's professional services; and its use of departmental organization, peer review, rules and regulations, credentialing and privileging practices. Appellant asserts, without citation to the record, that Allen's exercise of independent medical judgment was subject to AEMC's right of control because: his work may not be delegated to others, except as the hospital's rules permit; his medical findings must be reported in a manner and within a time frame set by hospital policy; and he must perform the requested study according to departmental protocols and schedule. Appellant also relies on Dr. Allen's testimony that he surmised that there was a hospital and departmental regulation requiring him to obtain Valles' consent to the procedure.

---

11. In addition to *Budzichowski,* Amicus Curiae, the Pennsylvania Trial Lawyers Association, directs our attention to other cases in which courts have addressed whether physicians are employees. *Cf. Kinloch v. Tonsey,* 325 Pa.Super. 476, 473 A.2d 167 (1984) (physician who was medical director, worked eight hours per day and was compensated in the same manner as other full time employees was an employee, even though he worked as a private physician on nights and weekends) and *Zimmerman, supra* (physician deemed to be independent contractor rather than an employee where, *inter alia,* he worked part-time, carried his own malpractice insurance, and had different fringe benefits and working conditions than other employees).

Transcript of Allen testimony at 24. In light of these factors, Appellant contends that she is entitled to the inference that Allen was an employee of the hospital, so that a question of fact exists which must be presented to a jury.

Even if we were to assume *arguendo* that Allen was an employee, Appellant is still not entitled to relief. We reach this conclusion since we find that a battery which results from a lack of informed consent is not the type of action that occurs within the scope of employment. In our view, a medical facility cannot maintain control over this aspect of the physician-patient relationship. Our lower courts have recognized that the duty to obtain informed consent belongs solely to the physician. *See, e.g., Kelly; Friter.* Informed consent flows from the discussions each patient has with his physician, based on the facts and circumstances each case presents. We decline to interject an element of a hospital's control into this highly individualized and dynamic relationship. We agree with the lower court that to do so would be both improvident and unworkable. Thus, we hold that as a matter of law, a medical facility lacks the control over the manner in which the physician performs his duty to obtain informed consent so as to render the facility vicariously liable.

Because of the unique nature of the informed consent doctrine, we find a battery in this context to be distinguishable from those cases in which an employer has been held vicariously liable for its employee's assault. *Orr,* supra. *Tonsic, Budzichowski, Kinloch* and *Zimmerman* are inapt as they did not involve an employment relationship in an informed consent context. *Grabowski,* also cited by Appellant, is distinguishable, for there, the defendant-physician directed the second physician to perform the surgery. *See* Restatement (Second) of Agency, § 212 ("A person is subject to liability for the consequences of another's conduct which results from his directions as he would be for his own personal conduct if, with knowledge of the conditions, he intends the conduct...."). That is not the case in the instant matter. Thus, we hold that a medical facility cannot be held vicariously liable for a physician's failure to obtain informed consent. The Superior Court correctly determined that AEMC was entitled to summary judgment as a matter of law.

 We now turn to Appellant's second issue and Morros' cross-appeal, issues which arise from Morros' attempted insertion of the Permacath. Appellant argues that her expert opined that the femoral vein was a viable alternative site of placement which did not carry the risks which attended the subclavian vein site. This alternative was not disclosed to Valles. As she adduced sufficient evidence to create an issue of fact, Appellant maintains that the question should have been submitted to a jury. In affirming the dismissal of the case, the Superior Court improperly relied on Morros' oral testimony only, and ignored her expert's testimony, in violation of the rule that the defendant's oral testimony cannot be the basis for summary judgment in his favor. *See Borough of Nanty–Glo v. American Surety Co. of New York,* 309 Pa. 236, 163 A. 523 (1932). Morros responds that Valles consented to the procedure that was performed, and that information relative to the alternative sites was not material information which must be disclosed. He further contends that the placement of the catheter is in fact an issue of negligence, rather than informed consent.

In his cross-appeal, Morros argues that the Superior Court impermissibly extended the scope of the informed consent doctrine when it determined that "informed consent applies to the method or manner

of surgery and the risks associated therewith." 758 A.2d at 1246. He argues that the informed consent doctrine requires the physician to advise the patient only as to the risks of the surgery proposed, and not the alternative methods or means of performing a surgical procedure. Appellant responds that the central premise of informed consent is patient self-determination, a goal which is satisfied only if patients are advised of all considerations which a prudent patient would consider material to a decision to undergo surgery, including the alternative methods or manner of performing the surgery proposed.

We agree with Morros' position. We recently reiterated in *Duttry* that "the doctrine of informed consent is a limited one." 771 A.2d at 1258. In light of this limited scope, we find that the manner or method in which the surgeon performs the proposed procedure is not encompassed within the purview of the informed consent doctrine. Although there were several methods of performing the particular surgery, there was only one surgery proposed: the insertion of a Permacath. Appellant does not dispute that Valles was adequately informed of the risks attending the surgery: bleeding, lung collapse, and death. That the subclavian vein may not have been the optimum site is not an issue of informed consent, but of negligence in the physician's decision to place the Permacath at that site. Thus, the trial court properly entered judgment in favor of Morros on the informed consent claim, and the decision of the Superior Court is affirmed, albeit on other grounds. *Moorhead v. Crozer Chester Medical Center,* 564 Pa. 156, 765 A.2d 786, 787 n. 2 (2001).

The order of the Superior Court is affirmed.

Former Chief Justice FLAHERTY did not participate in the decision of this case.

Justice SAYLOR files a Concurring and Dissenting Opinion.

Justice NIGRO files a Dissenting Opinion.

Justice SAYLOR concurring and dissenting.

With regard to the issue of informed consent as it pertains to Dr. Morros' attempted placement of the Permacath, I join the majority opinion, as I agree that the doctrine of informed consent, at least under the presently prevailing interpretation of the pertinent statute, *see generally Montgomery v. Bazaz–Sehgal,* 568 Pa. 574, 798 A.2d 742 (2002), does not encompass a choice among alternative sites for performing a surgical procedure such as the insertion of a Permacath.[1]

As to whether a hospital may be held vicariously liable for an employee-physician's failure to obtain a patient's informed consent, I respectfully dissent from the majority's holding that it cannot, and, as to this issue, join Mr. Justice Nigro's dissenting opinion to the contrary.

Justice NIGRO dissenting.

I respectfully dissent from the majority opinion because I believe that the trial court erroneously granted summary judgment on Appellant Esmelinda Valles's claim against Appellee Albert Einstein Medical Center ("AEMC") as well as her claim against Cross–Appellant Dr. Jay Morros ("Dr. Morros").

With regard to Appellant's claim that AEMC was vicariously liable for Dr. Steven Allen's failure to obtain Lope Valles's ("Valles") informed consent prior to per-

---

**1.** As I noted in *Montgomery,* at least the argument can be made that the General Assembly's recent amendments to the statute incor-

porate negligence concepts. *See id.* at 591–92, 798 A.2d at 753 (Saylor, J., concurring).

forming the aortogram, I disagree, in the first instance, with the majority's conclusion that the evidence failed to establish that Dr. Allen was employed by AEMC. In fact, I believe that the record shows the contrary given Dr. Allen's testimony that he was a radiologist employed by AEMC when he performed the aortogram on Valles. *See* Deposition of Dr. Steven Allen, 1/21/98, at 7, 23.

I also disagree with the majority's finding that regardless of whether or not Dr. Allen was an employee of AEMC, AEMC cannot be vicariously liable for a failure by Dr. Allen to obtain Valles's informed consent, because a battery resulting from a physician's failure to obtain a patient's informed consent for a surgery,[1] is not an action that can be included within the scope of a hospital's relationship with its employee. As noted by the majority, a hospital may be vicariously liable for injuries to its patients caused by the wrongful acts of its employees committed during the course and within the scope of the employment relationship. *Thompson v. Nason Hosp.*, 527 Pa. 330, 591 A.2d 703, 707 (1991); *Tonsic v. Wagner*, 458 Pa. 246, 329 A.2d 497, 501 (1974); *Lunn v. Boyd*, 403 Pa. 231, 169 A.2d 103, 104 (1961). An employee's conduct is considered "within the scope of employment" for purposes of vicarious liability if: (1) it is of a kind and nature that the employee is employed to perform; (2) it occurs within the authorized time and space limits of the employment; (3) it is actuated at least in part by a purpose to serve the employer; and (4) the use of force is expected by the employer and then force is intentionally used against another. *See R.A. v. First Church of Christ*, 748 A.2d 692, 699 (Pa.Su-

per.2000) (citations omitted). Where more than one inference can be drawn from the facts, the issue of whether or not a servant is acting for his employer and within the scope of his employment is one for the jury. *Iandiorio v. Kriss & Senko Enterprises, Inc.*, 512 Pa. 392, 517 A.2d 530, 533 (1986); *Lunn v. Boyd*, 403 Pa. 231, 169 A.2d 103, 104 (1961).

When a hospital hires a physician to perform surgical procedures on its patients, the physician's performance of those procedures is an act necessarily included in the scope of the physician's employment relationship with the hospital. The surgery on the patient is clearly the kind of work the hospital hired the physician-employee to perform. The physician-employee performs the surgery during working hours, inside the hospital's walls, and in order to serve the hospital's purpose of caring for sick and injured patients. *See e.g., Thompson*, 591 A.2d at 707. Finally, in hiring the physician to perform surgeries on its patients, the hospital undoubtedly expects the physician-employee to physically touch its patients. Therefore, a physician-employee's performance of a surgical procedure is an act within the scope of the physician's relationship with the hospital and the hospital may be vicariously liable when the physician fails to properly perform a surgery. Moreover, a physician's duty to obtain a patient's informed consent before the surgery is an integral part of the performance of the surgery. *See Morgan*, 704 A.2d at 619 (it is well-established under the law that as a prerequisite to performing any surgical procedure, the physician performing the surgery must obtain the informed consent of the patient undergoing the sur-

---

1. *Morgan v. MacPhail, M.D.*, 550 Pa. 202, 704 A.2d 617, 620 (1997). As I noted in *Morgan*, I believe that a physician should be liable for negligence where the physician fails to obtain the patient's informed consent. *Id.* at 622.

Nonetheless, my conclusion in the instant case is the same whether or not a physician is liable for failing to obtain a patient's informed consent under a negligence theory or under a battery theory.

gery). In my view, therefore, the physician's duty to obtain a patient's informed consent before performing the surgery is included within the scope of the physician's employment relationship with the hospital. *Compare Fitzgerald v. McCutcheon,* 270 Pa.Super. 102, 410 A.2d 1270, 1272 (1979) (police officer's act of shooting neighbor was not within scope of employment as it occurred while he was off-duty, it was motivated by reasons personal to himself, and it was not done for the purpose of his employment). Thus, unlike the majority, I would find that where a physician-employee fails to obtain a patient's informed consent before performing a surgical procedure, the hospital-employer is vicariously liable for that failure.

In the instant case, the evidence showed that Dr. Allen may not have properly obtained Valles's informed consent prior to performing the aortogram because the written consent form given by Dr. Muriel Gordon, an AEMC medical resident, to Valles prior to the aortogram failed to explain that there was a risk that kidney failure could result from the procedure. Given this evidence, along with the evidence showing that AEMC employed Dr. Allen to perform radiological work, including the aortogram performed on Valles, I believe that a genuine issue of material fact existed as to whether Dr. Allen failed to properly obtain Valles's informed consent and if so, whether AEMC was vicariously liable for that failure. Accordingly, I believe that the jury should have been allowed to consider these issues, and therefore, that the trial court erred in granting summary judgment in favor of AEMC. *See Iandiorio,* 517 A.2d at 533.

As to Appellant's claim that Dr. Morros failed to properly obtain Valles's informed consent before the surgery to implant the Permacath because he did not advise Valles of the viable alternative sites for placement of the Permacath, I agree with the majority that based on the rule established by this Court in *Borough of Nanty–Glo v. American Surety Co. of New York,* 309 Pa. 236, 163. A. 523 (1932), the Superior Court improperly concluded that Dr. Morros's oral testimony established that the right subclavien vein was the only viable site for the Permacath. I further agree with the majority that the Superior Court improperly determined that pursuant to the informed consent doctrine, a physician must inform his patient of the method or manner of performing a surgery and the risks associated therewith. Nevertheless, in my view, where a physician believes that there is more than one viable site for performing a surgical procedure, the location for the procedure concerns alternative types of treatment available to the patient. Further, the patient should be advised of those alternative types of treatment, *i.e.,* the viable locations for the surgery, as well as the risks associated with each location.[2] *See Gouse v. Cassel,* 532 Pa. 197, 615 A.2d 331, 333 (1992) (physician must inform patient of material facts, risks, complications and alternatives to surgical treatment that a reasonable person in patient's situation would consider significant in deciding whether to undergo surgery); *Stover v. Association of Thoracic and Cardiovascular Surgeons,* 431 Pa.Super. 11, 635 A.2d 1047, 1051–52 (1994) (pursuant to informed consent doctrine, physician was required to inform patient needing heart valve replacement of viable alternative types of heart valves and risks associated with those valves). Accordingly, in the instant case, I would find that the jury should have been permitted to assess the credibility of Dr. Morros's

---

**2.** Notably, Dr. Alan Wladis, who obtained Valles's informed consent for the Permacath procedure, testified that he routinely advised patients of the possible areas where the Permacath could be placed. N.T., 2/28/96, at 43.

testimony to determine whether or not he believed that the right subclavien vein was the only viable site for the Permacath. Given that the majority finds otherwise, I must respectfully dissent.