855 A.2d 842

**DEPARTMENT OF PUBLIC WELFARE, Appellant,**

**v.**

**DEVEREUX HOSPITAL TEXAS TREATMENT NETWORK (K.C.), Appellee,**

**Department of Public Welfare, Appellant,**

**v.**

**Devereux Hospital Texas Treatment Network (K.T.), Appellee,**

**Department of Public Welfare, Appellant,**

**v.**

**Devereux Hospital Texas Treatment Network (H.B.), Appellee.**

**Nos. 195–97 M.D. Appeal Docket 2003.**

Supreme Court of Pennsylvania.

Argued Dec. 2, 2003.

Decided Aug. 19, 2004.

Doris M. Leisch, Esq., Helene Eichenwald Loux, Esq., John A. Kane, Esq., Philadelphia, for the Department of Public Welfare.

M. Robin Maddox, Esq., Guy P. Vilim, Esq., Philadelphia, for Devereux Hospital Texas Treatment Network.

BEFORE: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and LAMB, JJ.

## OPINION

Justice NIGRO.

We granted allowance of appeal in these cases to consider whether the Commonwealth Court erred in reversing three administrative decisions of Appellant the Department of Public Welfare ("DPW") which denied Medical Assistance payments to Appellee Devereux Hospital Texas Treatment Facility ("Devereux") for certain care that Devereux rendered to three juveniles, K.C., K.T., and H.B. For the following reasons, we affirm in part and reverse in part.

Devereux is a Texas treatment facility that provides, among other things, inpatient psychiatric services. On the recommendation of the Philadelphia Department of Human Services ("DHS"), and pursuant to orders of the Philadelphia Court of Common Pleas, K.C., K.T., and H.B. were sent to Devereux for inpatient psychiatric treatment after having been adjudicated delinquent under the Juvenile Act, 42 Pa.C.S. §§ 6301–6365.[1] Thereafter, Devereux sought payment for the treat-

1. K.C. was admitted to Devereux for long-term psychiatric services on March 26, 1997, when he was eighteen years old and had been diagnosed with post-traumatic stress disorder, polysubstance abuse and depression. K.T. was admitted to Devereux on March 26, 1997, when he was nineteen years old and suffering from polysubstance dependence and a psychotic disorder. H.B. was admitted to Devereux on January 21, 1998, when he was eighteen years old and suffering from,

ment from DPW under Pennsylvania's Medical Assistance Program, but DPW denied the claims. Devereux appealed the denials to DPW's Bureau of Hearing and Appeals.

After hearings in each case, the Hearing Officer recommended that each appeal be denied. Specifically, the Hearing Officer concluded that DPW had correctly denied payment for K.C. and H.B., because DPW regulations only permit payment for non-emergency out-of-state services when there is no comparable in-state alternative and here, the record was devoid of competent evidence that there was no in-state alternative.[2] The Hearing Officer similarly concluded that DPW had properly denied payment for K.T.'s treatment, because DPW regulations "are clear that a provider is not entitled to reimbursement for days of care for recipients who are appropriate for an alternate level of care" and here, Devereux had stipulated that K.T. was "appropriate for treatment at an alternate level of care" during the relevant time period. Hearing Officer's K.T. Adjudication, at 6.[3]

The Bureau of Hearing and Appeals subsequently adopted the Hearing Officer's recommendations in all three cases, and

among other things, depressive symptomalogy and auditory hallucinations.

2. The Hearing Officer further stated that DPW had correctly denied payment with respect to K.C. and H.B. because Devereux was not entitled to bill for long-term inpatient psychiatric services when it had only been approved to participate in the Medical Assistance Program as a private psychiatric hospital. *See* 55 Pa.Code § 1151.2 (defining "private psychiatric hospital" as an institution ... providing acute short-term psychiatric services on an inpatient basis.) This determination, however, was later reversed by the Commonwealth Court, which explained that under DPW's own regulations, private psychiatric hospitals were authorized to receive payment for long-term inpatient psychiatric services, provided that those services were rendered to individuals under the age of twenty-one. *Devereux Hosp. Texas Treatment Network v. Dep't of Public Welfare*, 797 A.2d 1037, 1040 (Pa.Commw.2002) (citing 55 Pa.Code § 1151.43). DPW has not appealed the Commonwealth Court's decision in this regard and thus, we will not address that portion of the Commonwealth Court's decision here.

3. K.T. was admitted to Devereux on March 26, 1997, but Devereux was not an approved Medical Assistance provider of inpatient psychiatric services until August 27, 1997. Accordingly, Devereux only sought payment for services provided from August 27, 1997 until K.T.'s discharge on October 20, 1997.

the Secretary of the Department of Public Welfare (the "Secretary") upheld the Bureau's orders. However, on April 15, 2003, the Commonwealth Court reversed all three orders denying payment. *Devereux Hosp. Texas Treatment Network v. Dep't of Public Welfare,* 797 A.2d 1037 (Pa.Commw.2002). With respect to K.C. and H.B., the court reasoned and concluded as follows:

Under section 6352(a)(3) of the Juvenile Act, if a child is found to be delinquent, the court may commit the child to a facility for delinquent children operated under the supervision or direction of the court or other public authority and approved by DPW. 42 Pa.C.S. § 6352(a)(3). Such commitment shall be *"best suited* to the child's *treatment,* supervision rehabilitation, and welfare. ...." 42 Pa.C.S. § 6352(a) (emphasis added). In this case, the Court of Common Pleas of Philadelphia County found [K.C.] and [H.B.] to be delinquent children, and committed them to Devereux's facility, a facility supervised by a public authority and approved by DPW. Thus, the court determined that Devereux's facility was "best suited" to treat [K.C.] and [H.B.]. If commitment to Devereux's facility was "best suited" to the treatment needs of [K.C.] and [H.B.], then, certainly, Devereux's facility provided better access to the care they needed and was the only facility equipped to provide the type of care they needed.

Because DPW erred in concluding that it was impossible to determine from the record that Devereux provided better access to the care that [K.C.] and [H.B.] needed or that Devereux's facility was the only facility equipped to provide the type of care [K.C.] and [H.B.] required, DPW erred in denying payment for services rendered to [K.C.] and [H.B.] on that basis.

797 A.2d at 1041–42 (footnotes omitted).

With respect to K.T., the court stated simply that:

The commitment order of the Court of Common Pleas of Philadelphia County constituted a legal determination that [K.T.] was suitable for placement in Devereux's facility. Notwithstanding a finding to the contrary, until the court

issued a subsequent order declaring that [K.T.] was suitable for an alternate type or level of care, [K.T.] was *not* suitable for a different placement *as a matter of law.*

Because there was an unmodified legal determination that [K.T.] was suitable for placement in Devereux's facility, DPW erred in denying payment for services rendered to [K.T.] based on the contrary view that [K.T.] was suitable for an alternate type or level of care.

*Id.* at 1042 (emphasis in original).

On appeal to this Court, DPW contends that the Commonwealth Court erred in requiring it to utilize Medical Assistance funds to pay for Devereux's treatment of K.T., K.C. and H.B., when such treatment did not qualify for reimbursement under DPW regulations. Significantly, DPW in no way challenges the trial court's authority under the Juvenile Act to order that the three juveniles be placed at Devereux. Rather, it merely argues that funds other than Medical Assistance funds must be used to pay for that placement.[4]

Under Section 6352(a) of the Juvenile Act, a court is authorized to commit a child to a facility for delinquent children, provided, *inter alia,* that the placement is "best suited to the child's treatment, supervision, rehabilitation and welfare."[5]

---

**4.** Devereux repeatedly states in its brief to this Court that DPW takes the position that the trial court only had the authority to place H.B. and K.C. at Devereux if "it also determined that no placement inside Pennsylvania was more appropriate." Devereux's Brf. at 7–8; *see id.* at 18. However, this plainly misrepresents DPW's position. *See, e.g.,* DPW's Brf. at 18 ("No facts of record suggest that the juvenile court's orders of disposition, directed to DHS, were in any way inappropriate under the Juvenile Act.").

**5.** Section 6352(a)(3) provides in full:

    **§ 6352. Disposition of delinquent child**

    (a) General Rule.—If the child is found to be a delinquent child the court may make any of the following orders of disposition determined to be consistent with the protection of the public interest and best suited to the child's treatment, supervision, rehabilitation, and welfare, which disposition shall, as appropriate to the individual circumstances of each child's case, provide balanced attention to the protection of the community, the imposition of accountability for offenses committed and the development of competencies to enable the child to become a responsible and productive member of the community:
    * * *

42 Pa.C.S. § 6352(a). When such a commitment is ordered, the Public Welfare Code provides that DPW and the state and local county governments shall share the costs of necessary care. *See* 62 P.S. §§ 704.1, 704.2; 42 Pa.C.S. § 6306. However- er, to the extent a committed child is eligible for funds under Pennsylvania's Medical Assistance Program pursuant to DPW regulations, such funds must be exhausted before the child or provider may seek reimbursement from the state and local child welfare funds. *See* 62 P.S. § 704.2.

■ Pennsylvania's Medical Assistance Program, which is designed to provide medical assistance to certain individuals who cannot afford to pay for necessary medical services, was created pursuant to provisions in the Public Welfare Code (the "Code"),[6] and in accordance with the requirements of the federal Medicaid Act, 42 U.S.C. § 1396 *et seq.*[7] The Code vests DPW with responsibility for administration of the pro- gram, *see* 62 P.S. § 403, and for "establish[ing] rules, regula- tions and standards ... as to eligibility for assistance and as to its nature and extent." *Id.* § 403(b). To that end, DPW

> (3) Committing the child to an institution, youth development center, camp, or other facility for delinquent children operated under the direction or supervision of the court or other public authority and approved by the Department of Public Welfare....
>
> 42 Pa.C.S. § 6352(a)(3).

**6.** Act of June 13, 1967, P.L. 31, *as amended* 62 P.S. §§ 441.1–449.

**7.** The federal Medicaid Act (the "Act") provides for federal-state collab- oration in the provision of medical assistance. Specifically, the Act provides that states may elect to participate in the federal Medicaid program, as Pennsylvania has done, by preparing and submitting for federal approval a state Medicaid plan that complies with the Act and the regulations promulgated by the federal Department of Health and Human Services. *See* 42 U.S.C. § 1396a; 42 C.F.R. §§ 430–456. If the state plan is approved, the state will qualify for federal funding, which will cover part of the costs of the state's medical assistance program. *See* 42 U.S.C. § 1396b(a); *id.* § 1396d(b). Although "states are given considerable latitude in formulating the terms of their own medical assistance plans," their discretion is limited by the requirement that they must "fully comply with the federal statutes and regulations governing the program." *Addis v. Whitburn,* 153 F.3d 836, 840 (7th Cir.1998). Among other things, the Act requires that state plans "safe- guard against unnecessary utilization of ... care and services" and "assure that payments are consistent with efficiency, economy, and quality of care...." 42 U.S.C. § 1396a(a)(30)(A).

has promulgated regulations that, among other things, only permit the use of Medical Assistance funds for services that are "medically necessary," 55 Pa.Code § 1101.61, and specifically prohibit payment for inpatient psychiatric services after the patient has been determined to be "suitable for an alternate type or level of care." *Id.* § 1151.48(a)(15). In addition, DPW regulations provide that funds will only be provided for non-emergency out-of-state care if there is documentation to verify that the out-of-state facility is the "only facility equipped to provide the type of care that the individual requires." *Id.* § 1151.50(a)(2)(ii).

On appeal to this Court, DPW contends that the Commonwealth Court erred in failing to apply these regulations to deny payment for the services rendered to K.C., H.B. and K.T.[8] As the specific regulation that the Commonwealth Court considered in resolving Devereux's claims with respect to K.C. and H.B., *i.e.*, 55 Pa.Code § 1151.50(a)(2)(ii), differs from that which it considered in conjunction with Devereux's claims with respect to K.T., *i.e.*, 55 Pa.Code § 1151.48(a)(15), we will address DPW's claims with respect to K.C. and H.B. separately from its claims with regard to K.T.[9]

8. In reviewing a DPW decision to deny reimbursement under the Medical Assistance program, the Commonwealth Court's scope of review is limited to determining whether any constitutional rights have been violated, whether there was an error of law or whether essential findings of fact are supported by substantial evidence. *Presbyterian Med. Center of Oakmont v. Dep't of Pub. Welfare*, 792 A.2d 23, 26 (Pa.Commw.2002); *Geriatric & Medical Servs., Inc. v. Dep't of Public Welfare*, 151 Pa.Cmwlth. 209, 616 A.2d 746, 747 (1992).

9. Significantly, Devereux does not argue that any of the regulations at issue here are clearly erroneous or inconsistent with either the Public Welfare Code or the federal Medicaid Act. *See Terminato v. Pennsylvania Nat'l Ins. Co.*, 538 Pa. 60, 645 A.2d 1287, 1293 (1994) (An administrative agency's interpretation of a statute in its regulations "is entitled to great weight, [although] the interpretation may be disregarded if the interpretation is clearly erroneous or inconsistent with the statute under which the regulation is promulgated."); *Caso v. Workers' Compensation Appeal Bd. (Sch. Dist. of Philadelphia)*, 576 Pa. 287, 839 A.2d 219, 221 (2003) ("The interpretation of a statute by those charged with its execution is entitled to great deference, and will not be overturned unless such construction is clearly erroneous.") Rather, it accepts the relevant regulations as valid and merely contends that they do not support denial of its claims for payment here.

In connection with K.C. and H.B., DPW argues that the Commonwealth Court erred in concluding that the trial court's determination under the Juvenile Act that placement at Devereux was "best suited" to the juveniles' "treatment, supervision, rehabilitation, and welfare," 42 Pa.C.S. § 6352, was sufficient to satisfy DPW's regulatory requirement that there be documentation to verify that Devereux, an out-of-state facility, was the "only facility equipped to provide the type of care that [K.C. and H.B.] required." 55 Pa.Code § 1151.50(a)(2)(ii). We agree.

In both K.C.'s and H.B.'s adjudications, the Hearing Officer noted that DPW regulations state that Medical Assistance funds may not be used to fund an out-of-state placement unless there is documentation to establish that the out-of-state facility is the "only facility equipped to provide the type of care that the individual requires." *Id.* Moreover, in both cases, the Hearing Officer concluded that there was no record documentation to support a conclusion that Devereux was the "only facility equipped to provide the type of care that [K.C. and H.B.] require[d]." *Id.*

Specifically, in the case of K.C., the Hearing Officer acknowledged that Devereux had submitted into evidence "a checklist of placement options," which included over fifty in-state facilities and indicated that at each facility, K.C. "was not accepted for admission due to his age, appropriateness for the facility or because referrals were generally not being accepted at that time." Hearing Officer's K.C. Adjudication, at 4, Finding of Fact ("F.O.F.") ¶ 4. However, the Hearing Officer noted that the "referral date" for each attempted placement was September 15, 1998, which was well after K.C. was discharged from Devereux on January 3, 1998. *See id.,* F.O.F. ¶ 5. As there was no additional evidence submitted that indicated that in-state options had been investigated either prior to or while K.C. was placed at Devereux, the Hearing Officer specifically found that there was "no documentation in the record that in-state placement options had been exhausted prior to [K.C.]'s placement in an out-of-state facility." *Id.* at 7. Moreover, the Hearing Officer stated that there had been

"no documentation submitted for the record that [Devereux] is the only private psychiatric hospital facility equipped to provide the type of care that [K.C.] requires as required under 55 Pa.Code § 1151.50.(a)(2)(ii)." *Id.*

Meanwhile, in the case of H.B., the Hearing Officer noted that the record contained a "Residential Treatment Facility" Checklist which "indicated that over 40 psychiatric facilities . . . had been contacted and were unable to provide placement of [H.B.] prior to his being referred to Devereux," but further stated that the same checklist indicated that "only 2 *acute care* psychiatric facilities" had been contacted. Hearing Officer's H.B. Adjudication, at 4, F.O.F. ¶ 20 (emphasis added). In addition, the Hearing Officer explicitly credited the testimony of DPW's representative, Dr. John Hume, that "there were forensic-type psychiatric facilities suitable to handle [H.B.]'s aggressive personality that were not contacted that were located in Pennsylvania. . . ." *Id.* at 9. Given this record evidence that potentially suitable in-state facilities had not even been contacted to see if they could accommodate H.B., the Hearing Officer ultimately found that the record was devoid of "documentation that Devereux is the *only* private psychiatric hospital facility equipped to provide the type of care that [H.B.] require[d] as required under 55 Pa.Code § 1151.50.(a)(2)(ii)." *Id.* (emphasis in original).

In reversing the Hearing Officer's decisions in these two cases, the Commonwealth Court did not point to any additional evidence that had been introduced by the parties which established that Devereux was the only facility adequately equipped to treat K.C. and H.B. Rather, the court merely noted that the trial court had committed both boys to Devereux pursuant to section 6352 of the Juvenile Act, 42 Pa.C.S. § 6352, which only authorizes the court to commit a juvenile to an institution that is "best suited to the child's treatment, supervision, rehabilitation, and welfare," and then reasoned that "[i]f commitment to Devereux's facility was 'best suited' to the treatment needs of [K.C.] and [H.B.], then, certainly, Devereux's facility provided better access to the care they needed and was the only facility equipped to provide the type

of care they needed." 797 A.2d at 1041. This reasoning, however, is fundamentally flawed.

As an initial matter, we agree with the Commonwealth Court that given the limitations on the trial court's authority pursuant to 42 Pa.C.S. § 6352, we must presume that the trial court concluded that placement at Devereux was "best suited" to "the treatment, supervision, rehabilitation and welfare" of K.C. and H.B. However, we do not agree that this determination alone is sufficient to establish that Devereux was the "*only* facility equipped to provide the type of care that the [juveniles'] required." 55 Pa.Code § 1150(a)(2)(ii) (emphasis added).

First, we note that it is possible for more than one facility to be "best suited" to a juvenile's needs and thus, merely because Devereux is "best suited" does not mean that there is not another in-state facility that is equally well-suited. *See In re Tameka M.*, 525 Pa. 348, 580 A.2d 750, 755 (1990) (noting that under 42 Pa.C.S. § 6351(a), trial court contemplating an "order of disposition *best suited* to the protection and physical, mental and moral welfare of [a dependent] child" may be faced with options of two "equally effective schools, both suited to the child's needs") (emphasis added). Moreover, where, as here, there is simply no indication in the record that DHS even considered all of the in-state options for K.C. and H.B., much less advised the trial court of such options,[10] we will not presume, as the Commonwealth Court did below, that the trial court considered all of the available in-state options and explicitly rejected them as inferior to Dever-

10. While one would expect DHS to exhaustively investigate all in-state options and thoroughly document that investigation in cases in which it is anticipating Medical Assistance reimbursement for an out-of state placement, there is simply no record evidence indicating that it did so in connection with K.C.'s and H.B.'s placements here. We can better understand that failure in K.C.'s case as the trial court issued its order committing K.C. to Devereux *before Devereux was even certified as a Medical Assistance provider of inpatient psychiatric services.* Under those circumstances, DHS could not have been anticipating that the Medical Assistance Program would pay for the placement, thus explaining its apparent lack of concern regarding compliance with DPW regulations.

eux.[11]   While we recognize that the trial court is required under 42 Pa.C.S. § 6352(a) to enter an order "best suited to [a juvenile's] treatment, supervision, rehabilitation, and welfare," we will not presume that it has failed in that duty if it considers only the placement options that the parties present to it and finds that at least one such option will be best suited to the juvenile's needs.   In other words, we do not believe that a court ordering placement under section 6352 should be required either to cross-examine the parties regarding the extent of their efforts to identify available facilities or to conduct its own exhaustive search and survey of placement options when it concludes that the juvenile's needs will be well served by an order placing the juvenile at one of proposed facilities and no party objects to the child's placement at that

11.  The Commonwealth Court appears to reason in the body of its opinion that the mere fact that the trial court determined Devereux to be "best suited" to K.C.'s and H.B.'s needs is sufficient to establish that it considered all potential in-state options.  *See also* Devereux's Brf. at 19 ("In issuing its orders to send the children to Texas, the court presumably determined that the Texas placement, and no other, was the placement best suited to the children's individual needs—that phrase in itself states that, in the court's judgment, no other placement, in or out of Pennsylvania is as well suited; the Texas program is the best suited.").  However, the court also suggests in a footnote that, as a factual matter, the trial court must have been advised of all available placement options, because the statute requires that it be advised of all available beds.  797 A.2d at 1041 n. 9. Specifically, the court notes that section 6353(c) of the Juvenile Act, 42 Pa.C.S. § 6353(c), requires DPW to notify the courts of available secure beds for serious juvenile offenders and available general residential beds for children adjudicated delinquent, and asserts that given this provision, the trial court must have been advised of "all available beds for delinquent children." *Id.* However, as DPW points out in its brief, section 6353(c) is inapposite here as it does not require DPW to report the availability of beds for *inpatient psychiatric services, i.e.,* the type of bed that K.C. and H.B. required here.  Moreover, we note that section 6353(c) does not require DPW to keep the courts continually apprised of the changing availability of beds, but rather, merely requires it to provide the court with a report regarding the availability of beds *"immediately after the Commonwealth adopts its budget."*  42 Pa.C.S. § 6353(c) (emphasis added). Accordingly, even if the report included information about beds for inpatient psychiatric services, the trial court could not possibly rely on this snapshot of availability to determine on an ongoing basis whether beds are empty at particular facilities, much less whether the facilities with empty beds are equipped to serve the individual needs of any particular juvenile requiring placement.

facility.[12] Accordingly, where, as in the instant case, the trial court issues a commitment order under section 6352 that no one disputes is well suited to the juvenile's needs, we will only consider that order as definitively establishing that the trial court deemed the selected facility to be the best suited facility *of those of which it was advised.*

Given this conclusion, we simply cannot agree with the Commonwealth Court that the trial court's mere issuance of the commitment orders here necessarily demonstrated compliance with DPW's regulatory requirement that all in-state placement options be exhausted before Medical Assistance funds could be released to pay for an out-of-state placement.[13]

12.  We emphasize that this is not to say that the trial court may simply rubber stamp a placement upon which the parties have agreed. Rather, the court must exercise "independent discretion in the interest of the child," *Tameka M.*, 580 A.2d at 753, to determine whether an order placing the child at any one of the suggested facilities will be best suited to the child's "treatment, supervision, rehabilitation, and welfare." 42 Pa.C.S. § 6352.

13.  Notably, the parties have cited to no provisions in the Juvenile Act that, like the DPW regulations, explicitly require that in-state options be considered before resorting to an out-of-state placement. Moreover, there is no indication in the record that the trial court considered, either independently or at the parties' urging, whether DPW funds would be available to pay for K.C.'s and H.B.'s placements at Devereux.

We recognize that in *Tameka M.*, which involved a dependent child in need of special schooling, this Court hypothesized in dicta that if the juvenile court were given a choice between two equally effective schools, one of which was reimbursable by DPW and one of which was not, it would be an abuse of discretion for the court to order placement at the non-reimbursable school. 580 A.2d at 755. We also recognize that out of context, this dicta could be read to suggest that in the instant case, the trial court would have abused its discretion by ordering placement at Devereux if that placement were nonreimbursable and there were an equally effective and reimbursable in-state option. However, unlike the hypothetical situation considered in *Tameka M.*, which necessarily contemplated the juvenile court being presented with two options, one reimbursable and one not, the record here does not establish that the trial court was presented with a placement option for which DPW reimbursement was necessarily available. Moreover, in *Tameka M.*, the financial implications of the two placement options were squarely presented to the juvenile court because Children and Youth Services explicitly objected to the nonreimbursable placement. Under those circumstances, it is understandable that the trial court would abuse its discretion by failing to consider the relative financial implications of the two placement options presented to it. In contrast,

55 Pa.Code § 1151.50(a)(2)(ii). Rather, we agree with DPW that documentation beyond the trial court's orders committing H.B. and K.C. to Devereux's custody was necessary in order to establish such compliance. Moreover, the Hearing Officer below clearly found that there was no additional documentation sufficient to establish that in-state options had been exhausted, and Devereux did not argue to the Commonwealth Court and does not now assert that this conclusion was in error,[14] instead arguing only that the trial court order was determinative. Accordingly, we reverse the order of the Commonwealth Court and reinstate the Secretary's orders upholding the denial of payment for treatment rendered to H.B. and K.C. pursuant to 55 Pa.Code § 1151.50(a)(2)(ii).[15]

in the instant case, there is simply no evidence in the record suggesting that any party asked the trial court to consider whether DPW funds would be available to pay for the selected placement and thus, it could not be considered an abuse of discretion for the trial court to fail to consider the availability of DPW reimbursement as a factor in its placement decision.

14. Notably, DHS filed an amicus brief in the Commonwealth Court and did not assert that it had exhausted all of its in-state options in compliance with 55 Pa.Code § 1151.50(a)(2)(ii). Rather, it merely argued that "[e]ven if there was some technical non-compliance with the applicable regulations," DPW should be equitably estopped from denying payment for the services rendered to K.C. and H.B. because Devereux "reasonably relied" on DHS's representations that it had been "unsuccessful in locating in-state placement for these children." DHS's Commw. Ct. Amicus Brf. at 12, 16.

While no similar equitable estoppel argument is now before us, we feel compelled to comment that DHS's suggestion that *DPW* should be made to pay Devereux because *DHS* may have misled Devereux regarding DHS's compliance with DPW regulations appears to turn equitable estoppel principles on their head. *See, e.g., Blofsen v. Cutaiar*, 460 Pa. 411, 333 A.2d 841, 843–44 (1975) (equitable estoppel applies against party that made misrepresentations). Indeed, from an equitable standpoint, it seems that if anyone could be made to pay Devereux as a result of any misrepresentation by DHS, it would appear to be DHS.

15. Devereux appears to argue that it is simply unfair to deny it reimbursement for the services it rendered to K.C. and H.B., because Medical Assistance "is the only legitimate source of payment" and thus, absent reimbursement by DPW, the facility will not be compensated for its considerable services. Devereux's Brf. at 13. Significantly, we agree with Devereux that it deserves to be paid for the services it rendered to K.C. and H.B. pursuant to the trial court's commitment orders. Furthermore, we in no way fault Devereux for the lack of

In contrast, we affirm the order of the Commonwealth Court insofar as it pertains to the treatment of K.T. DPW argues in its brief to this Court that the Commonwealth Court erred in concluding that Medical Assistance funds had to be used to pay for K.T.'s treatment even though that treatment was not "medically necessary" and thus, not subject to reim-

record documentation establishing that in-state placement options were exhausted before K.C. and H.B. were placed at Devereux.

However, in denying Devereux reimbursement from DPW here, we are merely applying the plain terms of DPW's regulation, the validity of which Devereux does not challenge. *See supra* n. 9. Moreover, even assuming *arguendo* that we were at liberty to ignore that regulation based on our own concerns regarding Devereux's ability to obtain compensation elsewhere, we cannot accept Devereux's assertion that it does not have any other source of compensation. As explained above, the Public Welfare Code clearly provides that state and local county governments will contribute to the costs of necessary care for children adjudicated delinquent under the Juvenile Act, and that available funding from "other existing or future private, public, local, State or Federal programs," including the Medical Assistance Program, are merely the first sources that should be tapped *if* they are available. 62 P.S. § 704.2; *see also id.* § 704.1; *Tameka M.*, 525 Pa. 348, 580 A.2d 750 (accepting without question that DPW regulations prohibit reimbursement for dependent child's Montessori schooling and concluding that county children and youth services must therefore pay for placement). Indeed, the record here makes clear that before Devereux became certified as a Medical Assistance provider and therefore became eligible to apply for reimbursement from the Medical Assistance Program, DHS reimbursed it for its services. *See* Testimony of Carolyn Villarubia, Executive Director of the Devereux Treatment Network, R.R. at 249a–250a (stating that prior to Devereux's Medical Assistance certification, placements were county-funded through DHS); Supplemental Information of Appellant Devereux at 2, ¶¶ 6–7, R.R. 51a ("Prior to August, 1997, Devereux provided services to juveniles from Pennsylvania through contracts with local county children and youth agencies. . . . In Philadelphia, the responsible children and youth agency is [DHS], with which Devereux had a contract."); 5/29/97 letter from DHS to Devereux, R.R. at 36a (stating that DHS "has approved placement of [K.T.] into [Devereux's] program at a per diem rate of $362.00 retroactive to March 26, 1997"). Moreover, to the extent that the record provides any indication as to how the trial court expected Devereux to be paid for the services rendered here, it suggests that the court anticipated that DHS would pick up the tab. *See* 4/30/97 Memorandum from Naomi Post, Deputy Chief of Family Court's Juvenile Branch to A.J. Kierans, Director of Court and Community Services for DHS, R.R. at 131a (requesting "special contract" for placement of K.C. at Devereux for expected duration of 9–12 months at a per diem rate of $362.00). Under these circumstances, it seems apparent that if DPW funds are not available to pay for K.C.'s and H.B.'s placements, either DHS or some other state or local source must pay Devereux for its services.

bursement by DPW. *See* 55 Pa.Code § 1101.61. According to DPW, the Commonwealth Court concluded that the trial court's placement order "obviated the need for Devereux to comply with [DPW's] duly promulgated regulations" that only permit payment for "medically necessary" treatment. 55 Pa. Code § 1101.61. Moreover, it contends that such a conclusion was in error because it was in complete disregard for this Court's "long-standing instruction that duly-promulgated agency regulations have the force of law, and strict compliance with such regulations is mandatory." DPW's Brf. at 14 (citing *Housing Auth. v. Pennsylvania State Civil Serv. Comm'n,* 556 Pa. 621, 730 A.2d 935, 942 (1999); *Rohrbaugh v. Pennsylvania Public Util. Comm'n,* 556 Pa. 199, 727 A.2d 1080, 1085 (1999); *Snizaski v. Zaleski,* 410 Pa. 548, 189 A.2d 284, 286 (1963)).

However, DPW's arguments in this regard are based on a fundamental misunderstanding of the Commonwealth Court's underlying opinion and order. As is apparent from a close reading of the Commonwealth Court's opinion, the court understood the Hearing Officer to have denied payment to Devereux based solely on his determination that DPW had established that K.T. had been "suitable for an alternate type or level of care." *See* 55 Pa.Code 1151.48(a)(15) (permitting DPW to deny payment for individuals "suitable for an alternate type or level of care"). Accordingly, on appeal, the Commonwealth Court considered only whether this limited determination had been correct. In holding that it had not been correct and that, in fact, K.T. had *not* been "suitable" for an alternative type or level of care because the trial court's commitment order remained in effect, the Commonwealth Court did not address or decide whether DPW might have been entitled to deny payment based on any *other* DPW regulation, such as 55 Pa.Code § 1101.61, which requires that Medical Assistance funds only be used to pay for "medically necessary" treatment.[16]

16. Neither party seems to recognize this limitation of the Commonwealth Court's holding. While DPW contends that the court concluded that the treatment was compensable regardless of whether it was medically necessary or not, *see, e.g.,* DPW's Brf. at 15 ("[T]he Commonwealth Court ruled that the common pleas placement order supplanted

■ ˙Under these circumstances, DPW's assertion that the Commonwealth Court order required it to pay for K.T.'s treatment in spite of the fact that the treatment was not medically necessary is simply incorrect as the order merely concluded that DPW could not *deny* Devereux's claim for payment pursuant to Regulation 1151.48(a)(15). Moreover, DPW does not take issue with the Commonwealth Court's conclusion that Regulation 1151.48(a)(15) alone did not provide adequate support for the denial of payment. Accordingly, we affirm the order of the Commonwealth Court insofar as it held that DPW could not deny payment for K.T.'s treatment based on Regulation 1151.48(a)(15). However, given that the Commonwealth Court did not acknowledge, much less resolve, DPW's argument that the treatment was not compensable because it was medically unnecessary,[17] we remand the matter

the 'medical necessity' requirement for K.T.'s continued stay at Devereux."), Devereux argues that the court found that the treatment was "medically necessary." *See, e.g.,* Devereux's Brf. at 7 ("[T]he Commonwealth Court ruled correctly that, until the Common Pleas Court ruled otherwise, K.T.'s placement at Devereux remained medically necessary....").

However, contrary to both parties' contentions, the Commonwealth Court simply did not consider DPW's argument that K.T.'s medical treatment was not "medically necessary." In fact, it did not even use the term "medically necessary" at any point in its opinion, much less attempt to interpret that term. Moreover, we will not presume that the Commonwealth Court's finding that K.T. was not "suitable for an alternate type or level of care" due to the existence of the unmodified commitment order is the equivalent of finding that the treatment was *"medically* necessary." Indeed, the DPW regulations themselves make clear that the inquiry as to whether a patient is "suitable for an alternate type or level of care" pursuant to 55 Pa.Code § 1151.48(a)(15) is not wholly coterminous with the inquiry as to whether or not the patient's treatment is "medically necessary." *See* 55 Pa.Code § 1151.48(b) ("[T]he Department will not pay inpatient psychiatric facilities for services or items provided in conjunction with the provision of a service or item in subsection (a) *even if the attending physician or hospital utilization review committee determines that the stay was medically necessary.*") (emphasis added).

17. DPW clearly stated in its original letter denying payment for K.T.'s treatment at Devereux that the regulations prohibited payment because the treatment had been medically unnecessary. 12/1/96 Ltr. from DPW to Devereux, R.R. 27a, at ¶ 1. Likewise, DPW made the same argument to the Hearing Officer. *See, e.g.,* Hearing Officer's K.T Adjudication, at 3–4; *id.* (setting forth issue as "[w]hether [DPW] was correct in denying

for consideration of that and any other properly preserved argument that could support DPW's denial of payment.

For the foregoing reasons, we reverse the Commonwealth Court's order insofar as it prohibited DPW from denying payment for K.C.'s and H.B.'s treatment based on a lack of documentation that Devereux was the only facility equipped to provide the type of care that the two juveniles required. However, we affirm the order insofar as it held that DPW could not deny payment for K.T.'s treatment based on a conclusion that K.T. was suitable for an alternate type or level of care. We nevertheless remand the matter for consideration of any other properly-preserved arguments as to why DPW may have been entitled to deny compensation for K.T.'s treatment.

Former Justice LAMB did not participate in the decision of this case.

Justice SAYLOR files a concurring and dissenting opinion.

Justice EAKIN files a dissenting opinion.

Justice SAYLOR, concurring and dissenting.

I agree with the central legal propositions advanced by DPW, namely, that the statutory authorization for placement of juvenile offenders in a DPW-approved medical facility does not control the availability of MA Program funding, but rather, the separate requirements of the MA Program control, and therefore, it may be necessary in certain circumstances to

compensation to [Devereux] for . . . services rendered to [K.T.], due to a delay in discharge and lack of medical necessity"). Finally, when Devereux appealed the denial of payment to the Commonwealth Court, it argued that it was improper for DPW to deny payment for K.T.'s treatment based on a lack of medical necessity, see Devereux's Commw. Ct. Brf. at 19–22, and DPW countered that Devereux had waived any arguments regarding medical necessity by failing to raise them in its statement of the questions involved, see Pa.R.A.P. 2116, but that in any event, DHS was entitled to deny payment on that basis. DPW's Commw. Ct. Brf. at 10–11. Under these circumstances, we are at a loss to understand why the Commonwealth Court did not either address the issue of medical necessity or remand the issue to the Hearing Officer to permit him to address that issue more fully.

pursue an alternate source of funding for non-MA-Program-approved treatment, in whole or in part, *see, e.g.,* 42 Pa.C.S. § 6306 (establishing a child welfare system to fund the cost of necessary care for children who are adjudicated dependent or delinquent under the Juvenile Act); 62 P.S. §§ 704.1–704–2 (allocating financial responsibility for the child welfare system). In this regard, there are strong cost control factors governing availability of MA Program funding. Additionally, in terms of reimbursement decision making, although certainly a degree of deference is due in favor of a common pleas court directing treatment, I do not believe that DPW should be deemed bound by the placement determination (to which it is not a party), at least in the absence of extraordinary circumstances. Rather, in my view, DPW's administrative reimbursement decision should be upheld where it is procedurally regular, in conformance with constitutional and statutory dictates, and grounded in findings supported by substantial evidence. *See* 2 Pa.C.S. § 704.

Additionally, I differ with the majority's approach to the question of reimbursement for Devereux services rendered to K.T. In this regard, I do not view the distinction between DPW's regulations concerning the guiding requirement of medical necessity as a prerequisite to reimbursement, *see* 55 Pa.Code § 1101.61, and the regulation delineating as noncompensable days of inpatient care provided to a recipient who is suitable for an alternate type or level of care, *see* 55 Pa.Code § 1151.48(a)(15), as material as concerns the hearing examiner's factual determination (adopted by DPW) that K.T. did not require the inpatient care provided by Devereux during the time period under consideration. Under the rubric of either provision, MA Program funds are simply unavailable, so long as DPW's finding is grounded in substantial evidence. In this regard, Devereux has conceded the suitability of an alternate level of care and the lack of actual medical reasons to support the continued placement, but has merely advanced the legal argument that its services must be deemed to remain medically necessary for MA reimbursement purposes even after a prescribed course of treatment has been completed

unless and until an alternative, suitable placement for the juvenile can be made. While the argument for continued funding may have some merit in relation to the obligations of the contracting agency (here, the Philadelphia Department of Human Services) or the child welfare system in general, with respect to MA reimbursement, I would hold that medical necessity and the suitability of an alternative level of care are to be determined according to medical standards of practice as is plainly provided in DPW's regulations, *see* 55 Pa.Code § 1101.21, at least in the absence of a successful validity challenge to such regulation (an effort Devereux does not undertake here).

I therefore join in the majority's disposition of this appeal with respect to reimbursement for services rendered to K.C. and H.B.; with respect to K.T., I respectfully dissent as I would uphold DPW's denial in that situation as well.

Justice EAKIN, dissenting.

I would affirm on the basis of the Commonwealth Court opinion. Accordingly, I dissent.